LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By: JOSEPH A. PANTOJA
86 Chambers Street – 3rd Floor
New York, New York  10007
Tel.: (212) 637-2785
Fax: (212) 637-2750
E-mail: joseph.pantoja@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BARBARA THOMPSON,

                    Plaintiff,

               -against-

ELAINE CHAO, Secretary, U.S. Department of
Labor,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF Case

No. 06 Civ. 8257 (JCF)

## DEFENDANT'S LOCAL RULE 56.1 STATEMENT

      Pursuant to Civil Rule 56.1 of the Local Rules of the United States District Court for the

Southern District of New York, defendant states that there is no genuine issue to be tried with

respect to the following material facts:[1]

      1.      Plaintiff Barbara Thompson ("Thompson"), who was born in July 1947, is an

African-American female who worked in the Office of Federal Contract Compliance Programs

---

[1]  References to "Baisden Decl.," "Montgomery Decl.," "Torres Decl.," and "Pantoja
Decl." are to the declarations of Kenneth J. Baisden, Sr., dated February __, 2009, Brenda
Montgomery, dated February 25, 2009, Rachel Torres, dated February 26, 2009, and Joseph A.
Pantoja, dated March 2, 2009.  References to "Thompson Tr." are to the deposition of the
plaintiff Barbara Thompson in this matter, selected pages of which, including the errata sheet, are
attached to the Pantoja Declaration as Exhibit 1.

("OFFCP"), Employment Standards Administration ("ESA"), DOL, from approximately 1979 to January 31, 2005.  *See* Thompson Tr. at 17-20, 66.

2.      In 1979, Thompson was reassigned to OFCCP as a Grade 11 Equal Opportunity Specialist ("EO Specialist") from another agency, and in 1981 she was promoted to Grade 12 EO Specialist, the highest grade for that career ladder position.  *See* Thompson Tr. at 19-20, 66-67.

3.      During the years that she worked at OFCCP, she assumed additional responsibilities but her title remained the same.  *Id*. at 68.

4.      Thompson's responsibilities as a EO Specialist included compliance checks of federal contractors, corporate reviews of the hiring and employment practices of federally-funded companies, full-scale compliance reviews, including certain immigration issues, and investigation of complaints of discrimination at federally-funded companies.  *See* Thompson Tr. at 68-71; Montgomery Decl. at ¶ 4.

5.      During these investigations, private companies made a wide range of personnel-related documents available to the EEO Specialist for review.  *See* Thompson Tr. at 68-87; Montgomery Decl. at ¶ 4.

6.      Corporate reviews entailed a review of all documents relating to hiring, such as applications and all other documents submitted by a candidate for employment, which could include the candidate's social security number, home address, and date of birth.  *See* Thompson Tr. at 73-74; Montgomery Decl. at ¶ 4.

7.      Full-scale compliance reviews entailed review of the contractor's affirmative action plan and a statistical analysis on hires, promotions, terminations, training, and compensation.  *See* Thompson Tr. at 75; Montgomery Decl. at ¶ 4.

2

8.     If there was reason to suspect an EEO violation, Thompson would go on site and review all of the documentation relating to the employees in question, which could include information such as an employee's social security number, home address, and place of birth.  *See* Thompson Tr. at 75-78; Montgomery Decl. at ¶ 4.

9.     During full-scale compliance reviews, Thompson also reviewed the "I-9" forms submitted by employees to establish their lawful entry into this country and their right to work. *See* Thompson Tr. at 79; Montgomery Decl. at ¶ 4.  That form could have included information such as the numbers of identity documents provided by the employees, including passports and alien registration cards.  *See* Thompson Tr. at 79-80; Montgomery Decl. at ¶ 4.

10.     To the extent that Thompson investigated complaints of disability-based employment discrimination, that investigation would have required review of any medical records provided by the employee to substantiate the claim.  *See* Thompson Tr. at 83-87; Montgomery Decl. at ¶ 4.

11.     From 1980 to approximately the end of 2003, Thompson worked out of an OFCCP office in Long Island, New York.  *See* Thompson Tr. at 87-88.  During that time period, Thompson conducted compliance reviews in Long Island and upstate New York, and she reported to the New York District Office.  *Id*. at 95-96.

12.     From 1997 through at least 2004, the Northeast Region's government travel credit cards were issued by Citibank and governed by a Cardholder Account Agreement between Citibank and the employee.  *See* Torres Decl. at ¶ 3; Baisden Decl. at ¶ 6; Thompson Tr. at 115.

13.     Since 1997, all EO Specialists, including Thompson, have had the privilege of using a government travel credit card.  *See* Thompson Tr. at 104, 114-116; Montgomery Decl. at ¶ 5; Baisden Decl. at ¶ 6; Torres Decl. at ¶ 4.

14.     The front of the government travel credit card assigned to Thompson contained the statement, "For Official Government Travel Only,"and the back of the card stated, "The use of this card is governed by the cardholder agreement."  Torres Decl. at ¶ 4; Montgomery Decl. at ¶ 5; Baisden Decl. at ¶ 6.

15.     Thompson would have entered into a Cardholder Account Agreement upon issuance of the government travel card and every time the card was replaced.  *See* Torres Decl. at ¶ 4; Montgomery Decl. at ¶ 5; Baisden Decl. at ¶ 6.

16.     The back of the card also included an area in which the cardholder was supposed to sign their name before the card could be valid for use.  *See* Torres Decl. at ¶ 4; Montgomery Decl. at ¶ 5; Baisden Decl. at ¶ 6.

17.     Thompson used her government travel credit card for personal use from 1997 through mid-2002 before her credit card usage was called into question in mid-2002.  *See* Thompson Tr. at 104, 109-10.

18.     On June 5, 2002, Rachel Torres ("Torres"), who was then an Administrative Officer with OFCCP, Employment Standards Administration ("ESA"), Northeast Region, received an email informing her that Thompson was suspected by OFCCP's National Office and Citibank of having misused her government credit card in connection with 25 transactions during May 2002.  *See* Torres Decl. at ¶ 5 and Ex. 1 (US 447-48).

19.     Torres shared this information with Thompson's supervisors so that they could inquire into whether the suspicious transactions were legitimate and take any appropriate action. Torres Decl. at ¶ 5.

20.     On June 14, 2002, Thompson attended a meeting with Stanley Wishnick ("Wishnick"), who was then the District Director of the New York District Office, Assistant District Director Manuel Falto, who was her immediate supervisor at the time, and a union representative, to address the charge of credit card abuse.  *See* Montgomery Decl. Ex. 1 at US 717; Torres Decl. at ¶ 5; Thompson Tr. at 120.

21.     At that meeting, Thompson acknowledged that she had used her government credit card for personal use after losing her personal, non-government credit cards.  *See* Montgomery Decl. Ex. 1 at US 717.

22.     On June 21, 2002, Thompson received an official reprimand from Wishnick for abuse of the government credit cared.  *See* Montgomery Decl. at ¶ 6 and Ex. 1; Torres Decl. at ¶ 5; Baisden Decl. at ¶ 11.

23.     In that reprimand, Wishnick advised Thompson that use of the government credit card to purchase goods and services for personal use constituted abuse of the card and that the reprimand "will be placed in your official personnel file for a period of up to three years." Montgomery Decl. Ex. 1 at US 718.

24.     In that reprimand, Wishnick warned that "[r]ecurrence of this abuse of your government credit card will not be tolerated and may lead to the cancellation of your government credit card, and more severe disciplinary action, up to and including termination of your employment with OFCCP."  *Id*.

25.    At about the same time Thompson received the reprimand in June 2002, Thompson noticed that she could not make any purchases with the government credit card at office supplies stores like OfficeMax, although she could still obtain cash advances with the card. *See* Thompson Tr. at 126, 192.

26.    Upon receiving the reprimand, Thompson did not challenge it and acknowledged that each of the 25 credit card transactions underlying the June 2002 reprimand had been made for personal expenses unrelated to her federal employment.  *See* Thompson Tr. at 105-07.

27.    Wishnick and Assistant District Director Manuel Falto, Thompson's immediate supervisor at the time, had never told Thompson that she could use the government credit card for personal transactions.  *See* Thompson Tr. at 121.

28.    As of the June 2002 reprimand, Thompson knew that she could not use her government travel credit card for personal purchases.  *See* Thompson Tr. at 115.

29.    After receiving the June 2002 reprimand, Thompson did not seek advice from any office of the DOL regarding the scope of permissible use of her government travel credit card. *See* Thompson Tr. at 113-15.

30.    In June 2002, DOL issued a reminder to all of its Citibank Government Travel Cardholders of their responsibilities when using the travel card, including that the card was only to be use for travel-related expenses.  *See* Torres Decl. at ¶ 6 and Ex. 3; Baisden Decl. at ¶ 7.

31.    To assist employees in their use of the travel card, the DOL  assigned travel card coordinators to each region to answer any questions regarding DOL's travel card program.  *Id*. at US 3731-32; Baisden Decl. at ¶ 7; Torres Decl. at ¶ 6.

32.     By email dated January 7, 2003, the agency reminded all ESA employees, which include EO Specialists, of the proper use of the government travel credit card.  *See* Torres Decl. at ¶ 7 and Ex. 4 (US 451).

33.     At some point during 2002 or 2003, Thompson began working from home under a "flexiplace" arrangement, which refers to paid employment performed away from the office.  *See* Thompson Tr. at 95; Montgomery Decl. at ¶ 8; Baisden Decl. at ¶ 8.

34.     The agency provided Thompson only with a computer, printer, and a modem, and she understood that "[she] was responsible for buying the other furniture to work at home." Thompson Tr. at 127; see also Montgomery Decl. at ¶ 8; Baisden Decl. at ¶ 8.

35.     Items in addition to the computer, printer, and modem that were obtained by the flexiplace employee for use at the flexiplace was the personal property of the employee, and those additional items did not have to be returned to the agency at the end of the flexiplace arrangement.  *See* Thompson Tr. at 128-32 (and errata for p. 130, line 13), 149-51.

36.     Thompson, like other flexiplace employees, was told to stop by the New York District Office, which had a non-travel government credit card that could be used to purchase furniture, equipment or supplies for her flexiplace.  *Id*. at 133-34; Baisden Decl. at ¶¶ 8-9; Montgomery Decl. at ¶ 8.

37.     At some point during the second half of 2002, Thompson obtained a replacement for the personal credit card that she had lost earlier in the year, which was either a Visa or MasterCard.  *See* Thompson Tr. at 42-45.  During 2003 and 2004, Thompson had that card, as well as additional Visa or MasterCard credit cards, and also certain store credit cards available for her personal use.  *See id*. at 46-52.

7

38.     From July 2002 though July 2004, Thompson bought most of her flexiplace-related supplies at OfficeMax.  *See* Thompson Tr. at 194-95.

39.     Shortly after receiving the June 2002 reprimand, Thompson realized that she could avoid the purchase restriction on her card by first obtaining a cash advance and then using the cash to buy merchandise at Office Max.  *Id*. at 190-92, 201 ("After I could not specifically make the purchase, then I used the cash advances to get the items that I needed."), 202-06.

40.     Starting on August 21, 2002, *i.e.*, just two months after her reprimand for credit card abuse, and despite the availability of her personal credit cards, Thompson began using her government travel credit card for cash advances, and she used that cash to purchase office equipment and supplies for her flexiplace.  *See* Thompson Tr. at 126-27, 134-35, 188.

41.     None of Thompson's supervisors, including former District Director Stanley Wishnick, Manuel Falto, Montgomery, or Baisden, ever advised her that she could use her government travel credit card to purchase office supplies, including furniture, equipment, or supplies for use at her flexiplace.  *See* Thompson Tr. at 176-85; Montgomery Decl. at ¶ 9; Baisden Decl. at ¶ 9.

42.     Thompson never inquired whether she could use her government travel credit card to obtain cash advances for office supplies that could not otherwise have been bought directly with the card.  *See* Thompson Tr. at 113-15; Montgomery Decl. at ¶ 9; Baisden Decl. at ¶ 9.

43.     Thompson never submitted vouchers for reimbursement of the cost of the office equipment and supplies that she purchased for her flexiplace, nor did she retain receipts for those items during the period July 2002 through July 2004.  *See* Thompson Tr. at 128-29, 133, 185; Montgomery Decl. at ¶ 9.

44.     During 2004, Torres was a Program Analyst for OFCCP's Northeast Regional Office, which was headed by then Acting Regional Director Harold Busch ("Busch").  *See* Torres Decl. at ¶ 1.

45.     In July 2004, the Northeast Region conducted an audit relating to the government credit card activities of approximately seventy-five employees.  *See* Torres Decl. at ¶ 8 and Ex. 5 (US 456-58); Baisden Decl. at ¶ 10; Montgomery Decl. at ¶ 10.

46.     Acting Regional Director Harold Busch ("Busch") asked Torres to perform the audit because certain employees in the Northeast Region were suspected of having misused their credit cards and that the audit was to cover the preceding year, *i.e.*, July 2003 to July 2004.  *See* Torres Decl. at ¶ 8.

47.     In July 2004, Torres advised Busch that the audit of Citibank travel cards had identified the accounts of three employees, including Thompson's, for possible credit card abuse. *See* Torres Decl. at ¶ 9.  By email dated August 18, 2004, Torres advised Busch that the same audit had identified four more individuals, including EO Specialist Pierre-Louis, who were suspected of credit card abuse.  *Id.* at ¶ 9 and Ex.6 (US 459).  In that email, Torres further advised Busch that she would be providing the employees' supervisors with a copy of the Citibank statements and request that they review the employees' travel records for any improprieties.  *Id*.

48.     Upon learning that Thompson was suspected of credit card abuse, Kenneth J. Baisden, Sr. ("Baisden"), then District Director of the New York District Office, inquired whether Thompson had a prior record of credit card abuse.  *See* Baisden Decl. at ¶ 11; Torres Decl. at ¶ 10.

9

49.     Thompson's official personnel folder included a copy of the written reprimand for credit card abuse that she had received in June 2002.  *See id*.

50.     As a result, Baisden asked Torres to check Thompson's credit card activities dating back to the issuance of her prior reprimand, *i.e.*, June 21, 2002.  *See id*.; Thompson Tr. at 98.

51.     Torres arranged to obtain Thompson's credit card statements for that two-year period.  *See* Torres Decl. at ¶ 10.

52.     At some point during July 2004, Baisden called Thompson into his office and asked her to turn in the government travel credit card.  *See* Baisden Decl. at ¶ 12.

53.     At that time, Thompson claimed that she had not made any cash advances on her card and that perhaps her son had used her card for the transactions in question.  *Id*.

54.     Baisden was not persuaded by Thompson's explanation since Baisden knew that any cash withdrawal at an ATM would have required the use of a Personal Identification Number.  *Id*.

55.     In early to mid-August 2004, Torres received Thompson's credit card statements for the period July 2002 through June 2004.  *See* Torres Decl. at ¶ 11 and Ex. 7 US 78-98).

56.     Whereas the June 2002 reprimand related to Thompson's use of her government travel credit card to make unauthorized purchases directly with the card, the transactions at issue concerned 26 cash advances from 2002 to 2004.  *Id*.; Montgomery Decl. at ¶¶ 11-12.

57.     Torres forwarded Thompson's credit card statements to Assistant District Director Brenda Montgomery ("Montgomery"), Thompson's immediate supervisor at the time, requesting

that Montgomery investigate whether the cash advances were legitimate and take any appropriate action.  *See* Torres Decl. at ¶ 12; Montgomery Decl. at ¶ 11; Thompson Tr. at 97.

58.     At that time, Baisden also received a copy of Thompson's credit card statements. *See* Baisden Decl. at ¶ 13.

59.     As Thompson's immediate supervisor, it was Montgomery's sole responsibility to determine whether an infraction had occurred and to propose any discipline.  *See* Montgomery Decl. at ¶ 12; Baisden Decl. at ¶ 4; Torres Decl. at ¶ 12.

60.     After Montgomery reviewed Thompson's credit card statements in conjunction with Thompson's travel vouchers and eliminated any cash advances that Thompson had made while she was traveling for the agency, Montgomery determined that there were approximately $1,600 worth of cash advances from ATMs during the period August 20, 2002, through April 30, 2004, that were never approved as expenses on travel vouchers by Montgomery or Baisden.  *See* Montgomery Decl. at ¶ 12.

61.     On August 19, 2004, Montgomery issued to Thompson a Notice of Proposed Removal, attached to which were the credit card statements for the period June 29, 2002 through May 28, 2004.  *See* Montgomery Decl. at 13 and Ex. 3 (US 684-709).

62.     A copy of that Notice and the accompanying credit card statements was also forwarded to Baisden as the deciding official.  *See id* at ¶ 14; Baisden Decl. at ¶ 14.

63.     The removal notice cited 26 specific transactions in which Thompson used her government travel credit card to make cash withdrawals of varying amounts totaling $1,619.60 that were unrelated to official government travel.  *Id*., Ex. 3 at US 684-86.

64.     Although Montgomery was not Thompson's immediate supervisor in 2002, Montgomery was told by Wishnick in 2002 that Thompson had received a reprimand for credit card abuse.  *See* Montgomery Decl. at ¶ 6.

65.     Montgomery would have proposed that Thompson be removed even in the absence of the June 2002 reprimand because Montgomery believed that credit card abuse was serious enough to warrant dismissal for a first offense, particularly in the case of a senior compliance officer with access to sensitive information concerning the employees of federal contractors that are investigated by OFCCP.  *See* Montgomery Decl. at ¶ 14.

66.     Because Thompson's abuse comprised numerous incidents over a prolonged period of time and after she had been already warned that continued misuse of the card could result in her termination, Montgomery essentially lost confidence in Thompson's ability to conduct herself with the integrity that the EO Specialist position requires.  *Id*.

67.     The agency ultimately reduced the total dollar amount of the specifications under the removal notice by $200 after applying two travel-related vouchers that Thompson had submitted during the two-year period underlying the notice of proposed removal.  *See* Thompson Tr. at 146-47.

68.     Thompson acknowledges having made each of the cash advances underlying the August 2004 notice of proposed removal and that at least a portion of them were obtained for non-travel-related expenses throughout the twenty-month period at issue.  *See* Thompson Tr. at 146-48.

69.     Through no fault of her employer, Thompson failed to submit vouchers evidencing a government-related purpose for the remaining 24 ATM withdrawals during the period August 2002 through April 2004.  *Id*. at 147, 151-52; Montgomery Decl. at ¶ 12.

70.     Thompson preferred to forego reimbursement for the $1,400 in question than go through "the hassle" of having to submit a voucher.  *See* Thompson Tr. at 147, 151-52; *see also* 36-38, 58-60.

71.     At the time Montgomery presented Thompson with the removal notice, Montgomery told her to read it carefully and to submit any response to Baisden.  *See* Montgomery Decl. at ¶ 15.  At that time, the only explanation that Thompson provided to Montgomery was that Thompson had authorized her son to use her government credit card.  *Id*. at ¶ 15.

72.     Prior to being notified in July 2004 about Thompson's suspected credit card abuse, Montgomery was not aware that Thompson had been using her government travel credit card for cash advances for which Thompson did not seek, or did not intend to seek, reimbursement.  *Id*.

73.     Baisden held off on making a decision until Thompson had responded to the removal notice.  *See* Baisden Decl. at ¶ 16.

74.     By letter dated September 29, 2004, Thompson's then attorney, Raymond Nardo ("Nardo"), responded to the notice of proposed removal.  *See id*. at ¶ 16 and Ex. 3 (US 680-82).

75.     On November 30, 2004, Thompson went to Baisden's office and made an oral reply to the notice of proposed removal.  *See* Baisden Decl. at ¶ 17 and Ex. 4 (US 678). Thompson explained that she had used the credit card for office supplies for her flexiplace, the

cost of which supplies was never reimbursed by the agency, and that she always paid the balance on her credit card account, and that she did not know why management had singled her out for discipline. *See id*. She alleged that former District Director Wishnick had advised her to use the government credit card to buy office supplies. *See id*. This time around, Thompson made no mention of any involvement by her son. *See id*. Nor did she state that the cash advances at issue related to official travel. *See id*.

76.     On December 6, 2004, Baisden provided Ms. Thompson with a memorandum summarizing her statements at the November 30, 2004 meeting. *See* Baisden Decl. at ¶ 18 and Ex. 4 (US 678); *see also* Thompson Tr. at 231-32.

77.     Baisden was not persuaded by Thompson's oral reply for several reasons, including that the card, on its face, was restricted and limited to travel-related expenses, and that Mr. Wishnick, whom Baisden remembered being a stickler for rules and regulations, would never have advised Thompson to misuse the card. *See* Baisden Decl. at ¶ 18.

78.     During 2002, 2003, and 2004, the New York District Office had a non-travel government credit card that could have been used for office supplies. *Id*.

79.     By memorandum dated January 13, 2005, Baisden issued a Removal Decision to Thompson. *See* Baisden Decl. at ¶ 20 and Ex. 5 (US 63-65). Baisden sustained the charge of credit card abuse and all the specifications in the removal notice. *Id*.

80.     The information that was available to Baisden at the time of his removal decision included Wishnick's June 21, 2002 reprimand, Montgomery's notice of proposed removal including the credit card statements at issue, Nardo's September 29, 2004 letter, and Thompson's oral reply. *Id*.

81.     In deciding that removal was warranted, Baisden considered Thompson's level of experience, years on the job, her level of responsibility, the sensitivity of her work, her apparently ability to be reformed, and the extent of his confidence that Thompson could function independently with government contractors and not compromise an investigation, among other things.  *Id*.

82.     Baisden found Thompson's level of experience, years on the job, and the sensitivity of her work to be aggravating factors.  *See* Baisden Decl. at ¶¶ 22, 24.

83.     Baisden essentially lost confidence in Thompson's ability to demonstrate the integrity required of her position as a government investigator because, despite her years of experience, she failed to appreciate rather obvious restrictions on the use of the travel card.  *Id*.

84.     Baisden also considered an aggravating factor the fact that Thompson started making the unauthorized cash withdrawals just weeks after her June 2002 reprimand for misuse of the same credit card, and despite having been warned in that reprimand that she could be fired for any additional misuse of the government credit card.  *Id*. at ¶ 23.

85.     Baisden was troubled by the fact that Thompson did not provide any evidence that the cash withdrawals were used for work-related purchases.  *Id*. at ¶ 24.

86.     Baisden also construed Thompson's initial efforts to attribute the credit card abuse to her son as an indication that she was not accepting responsibility.  *Id*. at ¶ 25.

87.     All factors considered, Baisden elected to remove Thompson because he had concluded that she lacked the integrity to hold the position of EO Specialist and likely could not be rehabilitated.  *Id*. at ¶ 26.

88.     In 2002, Wilson Pierre-Louis ("Pierre-Louis") was an EO Specialist who worked at an OFCCP office in New Jersey.  *See* Torres Decl. at ¶ 13.

89.     On June 5, 2002, Torres sent an email to Michele Hodge ("Hodge"), who was then Pierre-Louis's immediate supervisor, in which she listed transactions in May 2002 that had been flagged as suspicious by Citibank, and asked that Hodge look into whether the transactions were valid.  *See id.* at ¶ 13 and Ex. 10 (US 533-34).

90.     In 2002, Pierre-Louis was orally counseled by Hodge against using the government credit card to buy gasoline.  *See* Baisden Decl. at ¶ 31.

91.     In the fall of 2004, Pierre-Louis, like Thompson, was a Grade 12 EO Specialist assigned to the New York District Office.  *See* Montgomery Decl. at ¶ 3; Baisden Decl. at ¶ 27; Torres Decl. at ¶ 9.

92.     In July 2004, Torres identified Pierre-Louis as the second New York District Office employee with suspicious credit card activity during the preceding year.  *See* Torres Decl. at ¶ 9 and Ex. 6 (US 459) (identified as "Employee No. 4").

93.     As she had done with the approximately 75 employees who were the subject of the audit, Torres arranged to receive Pierre-Louis's credit card statements for the preceding year, but the statements she ultimately received for Pierre-Louis only went back to February 2004.  *Id.* at ¶ 14.

94.     Because Torres knew that Citibank did not issue statements for months during which there was no credit card activity, Torres assumed that Pierre-Louis, as had been the case with other employees, did not have any credit card transactions prior to February 2004.  *Id.*

Torres did not inquire whether Pierre-Louis had had any transactions under a different card number. *Id*.

95.     In or about August 2004, Torres informed management of Pierre-Louis's suspected credit card abuse, and in September 2004, Torres forwarded Pierre-Louis's February-July 2004 credit card statements to Montgomery so that she could determine whether the charges were legitimate and take appropriate action. *See* Torres Decl. at ¶ 15; Montgomery Decl. at ¶ 17; Baisden Decl. at ¶ 27.

96.     In September 2004, Torres also provided Baisden and Montgomery with information from Citibank regarding Pierre-Louis's delay in paying his government credit card bill. *See* Torres Decl. at ¶ 15 and Ex. 11 (US 461-62); Baisden Decl. at ¶ 27; Montgomery Decl. at ¶ 17.

97.     When Baisden learned in August 2004 that Mr. Pierre-Louis was the second employee in the New York District Office who was suspected of having misused his travel card during the preceding year, he did not ask Torres to review Mr. Pierre-Louis's credit card statements beyond the preceding year because Pierre-Louis's official personnel folder did not reflect any prior history of credit card abuse. *See* Baisden Decl. at ¶ 27.

98.     On October 14, 2004, Montgomery issued Pierre-Louis a notice of proposed removal for alleged misuse of his government credit card on 45 separate occasions during the period February 23, 2004 through July 26, 2004. *See* Montgomery Decl. at ¶ 18 and Ex. 6.

99.     The notice of proposed removal issued to Pierre-Louis did not make reference to the oral counseling that Hodge gave Pierre-Louis in 2002 because Montgomery was not aware that he had previously received counseling relating to the use of his government credit card. *See* Montgomery Decl. at ¶ 18 and Ex. 6.

17

100.    By memorandum dated January 13, 2005, Baisden sustained forty-four of the forty-five specifications under the charge, finding that Pierre-Louis's misuse of the card amounted to approximately $1,700.  *See* Baisden Decl. at ¶ 29 and Ex. 7 (US 438-40).

101.    However, Baisden determined that Pierre-Louis should be suspended for sixty days without pay rather than removed because, unlike Thompson, Pierre-Louis had only been with OFCCP for four years, had misused his card for only a fraction of the time that Thompson had, and, as far as Baisden knew, had no prior history of credit card abuse or prior notice that he could be terminated for such misconduct.  *See* Baisden Decl. at ¶ 29 and Ex. 7.  As far as Baisden was concerned, Montgomery had proposed that Pierre-Louis be removed for a first time offense. *See* Baisden Decl. at ¶ 29.

102.    Pierre-Louis eventually appealed his suspension to the MSPB, and the matter was settled by reducing the suspension to 45 days without pay.  *Id*. at ¶ 30.

103.    It was not until June 2005 that Baisden and Montgomery learned that Pierre-Louis, like Thompson, had a prior history of credit card abuse.  *See* Baisden Decl. at ¶ 32; Montgomery Decl. at ¶ 20.

104.    The particular credit card account underlying the October 2004 notice of proposed removal of Pierre-Louis had not been open long prior to February 2004, because he had been given a new account number for security reasons.  *See* Torres Decl. at ¶ 17.

105.    During the June 2005 deposition of Pierre-Louis in Thompson's MSPB proceeding, Pierre-Louis revealed that, prior to February 2004, he had misused a previous government credit card, information that was not before Montgomery or Baisden at the times that

they had proposed Pierre-Louis's removal and suspension, respectively. *See* Torres Decl. at ¶ 17; Montgomery Decl at ¶ 20; Baisden Decl. at ¶ 31.

106.   At the conclusion of Pierre-Louis's deposition, the agency's attorney contacted Torres, who then asked the regional finance officer to inquire with Citibank about Pierre-Louis's prior accounts. *See* Torres Decl. at ¶ 17.

107.   Torres eventually received the credit card statements for Pierre-Louis's previous account. *See id.* at ¶ 17 and Ex. 14 (US 211-33).

108.   As a result of the July 2004 audit, there were ultimately six employees from the Northeast Region who were found to have abused their credit card during all or part of the period July 2003 to July 2004. *See* Torres Decl. at ¶ 18 and Ex. 15 (US 436-37).

109.   Removal was proposed for five of those six employees, including Thompson and Pierre-Louis, who were the only employees from the New York District Office. *Id.* at ¶ 18 and Ex. 15 at US 436.

110.   Baisden was the deciding official in the Thompson and Pierre-Louis matters because they were assigned to the New York District Office. Baisden Decl. at ¶ 4; Torres Decl. at ¶ 18.

111.   Montgomery and Baisden had no involvement in the discipline that was proposed or ultimately selected for employees outside of the New York District Office. *See* Montgomery Decl. at ¶ 21; Baisden Decl. at ¶ 32.

112.   Baisden is African-American male and is 59 years old. *See* Baisden Decl. at ¶ 2.

113.   In January 2005, when Baisden decided upon Thompson's removal, he believed that he was older than Thompson. *See* Baisden Decl. at ¶ 36.

114.    Montgomery was born in the United States and is 53 years old.  *See* Montgomery Decl. at ¶ 2.

115.    Wilson Pierre-Louis is of Haitian descent and was approximately 45 years old when he received his suspension.  *See* Pantoja Decl., Ex. 2 at US 324.

116.    Thompson believed Wishnick was very strict and the kind of person who kept every piece of paper, but overall Thompson considered him a very fair person.  *See* Thompson Tr. at 274-75.

117.    Thompson is not aware of any of her supervisors in the New York District Office who had disciplined her since 2002, *i.e.*, Wishnick, Baisden, or Montgomery, having ever made a comment that she found offensive concerning her or anyone else's national origin, gender, or age. *See* Thompson Tr. at 274-81.

118.    Thompson is not aware of anyone at the Northeast Regional Office that conducted the audit, *i.e.*, Harold Busch, Steven Sunshine, and Rachel Torres, having ever made a comment that she found offensive concerning her or anyone else's national origin, gender, or age.  *See* Thompson Tr. at 281-88.

By submitting this statement, defendant does not waive her right to contend that the above-referenced facts are not material to the present action.

Dated:  New York, New York
        March 2, 2009

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorney for Defendant


        /s/ Joseph A. Pantoja
By:    JOSEPH A. PANTOJA
       Assistant United States Attorney
       86 Chambers Street, 3rd Floor
       New York, New York 10007
       Tel.: (212) 637-2785
       Fax: (212) 637-2750
       E-mail: joseph.pantoja@usdoj.gov