```
UNITED STATES DISTRICT COURT              (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
BARBARA THOMPSON,                    :    06 Civ. 8257 (JCF)
                                     :
            Plaintiff,               :    MEMORANDUM
                                     :    AND  ORDER
    - against -                      :
                                     :
ELAINE L. CHAO, Secretary,           :
U.S. Department of Labor,            :
                                     :
            Defendant.               :
- - - - - - - - - - - - - - - - - - -:
```
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

This is an employment discrimination action brought by Barbara Thompson against her former employer, the United States Department of Labor ("DOL"). Ms. Thompson asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. § 621 et seq. She alleges that she was terminated on the basis of her gender, national origin, and age.

The parties previously consented to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c). DOL now moves under Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing all of the plaintiff's claims. For the reasons set forth below, the motion is granted.

Background

Barbara Thompson is an American-born black woman who is currently sixty-two years old. (Defendant's Local Rule 56.1 Statement ("Def. Facts"), ¶ 1; Plaintiff's Statement of Facts in

Opposition to Defendant's Motion for Summary Judgment ("Pl. Facts"), ¶ 9). Ms. Thompson began working as a Grade 11 Equal Opportunity Specialist in the Office of Federal Contract Compliance Programs ("the OFCCP") of the Employment Standards Administration ("the ESA") at DOL in approximately 1979. (Def. Facts, ¶¶ 1- 2; Pl. Facts, ¶ 1). In 1981, she was promoted to the position of Grade 12 Equal Opportunity Specialist, the highest grade available. (Def. Facts, ¶ 2).

As an Equal Opportunity Specialist, Ms. Thompson performed compliance evaluations on private companies receiving federal funds and investigated complaints of discrimination against them. (Pl. Facts, ¶¶ 10-13; Deposition of Barbara Thompson ("Thompson Dep."), excerpts attached as Exh. 1 to Declaration of Joseph A. Pantoja dated March 2, 2009, at 68-72). An Equal Opportunity Specialist's duties included the review of personnel files containing employees' and job applicants' private information, such as their social security numbers, home addresses, immigration status, and medical records. (Thompson Dep. at 72-87). While it was not the plaintiff's job to analyze the confidential information contained within these personnel files, and many employers blacked out or coded employees' private information before giving the files to Ms. Thompson, she nonetheless did sometimes have access to that information in the course of her work as an Equal Opportunity Specialist. (Thompson Dep. at 72-87).

From 1980 until August of 1998, Ms. Thompson worked in the OFCCP's Long Island District Office. (Def. Facts, ¶ 11; Plaintiff's Challenges to Defendant's Statement of Material Facts ("Pl. Challenges"), ¶ 33; Thompson Dep. at 87-88, 95-96). In August of 1998, she began working from home on a regular basis as part of a "flexiplace" arrangement. (Pl. Challenges, ¶ 33).[1] The OFCCP provided her with a computer, a printer, and a modem for her home work space; Ms. Thompson was responsible for purchasing additional office supplies herself. (Pl. Facts, ¶¶ 34-35; Thompson Dep. at 127-30).

In 1997, Citibank issued every Equal Opportunity Specialist, including the plaintiff, a federal government credit card. (Def. Facts, ¶¶ 12-13). The words "For Official Government Travel Only" were printed on the front of every card. (Def. Facts, ¶ 14). On June 21, 2002, Stanley Wishnick, the District Director of the OFCCP's New York office at the time, issued a memorandum reprimanding Ms. Thompson for misuse of her federal government credit card. (Memorandum dated June 21, 2002 ("2002 Memo"),

---

[1] In her deposition testimony, Ms. Thompson stated that her "flexiplace" arrangement began sometime in 2003. (Thompson Dep. at 95). Based on this statement, the defendant asserted in its Local Rule 56.1 Statement that Ms. Thompson began working under a "flexiplace" arrangement sometime in 2002 or 2003. (Def. Facts, ¶ 33). In her response to the defendant's Rule 56.1 Statement, however, Ms. Thompson stated that the date she had given at her deposition was incorrect, and that she actually began her "flexiplace" arrangement on August 7, 1998. (Pl. Challenges, ¶ 33).

attached as Exh. 6 to Pl. Facts).  The memorandum stated that she had used the card to purchase "goods and services that were not related to official government duties and responsibilities." (2002 Memo at 1).  The memorandum further stated that "[r]ecurrence of this abuse of your government credit card will not be tolerated and may lead to . . . severe disciplinary action, up to and including termination of your employment with OFCCP."  (2002 Memo at 2).

Approximately two weeks after she received the memorandum reprimanding her for misuse of her federal government credit card, Ms. Thompson began taking out ATM cash advances on the card. (Thompson Dep. at 126).  She continued to do so until April 30, 2004.  (Notice of Proposed Removal dated Aug. 19, 2004 ("Proposed Removal Notice"), attached as Exh. 10 to Pl. Facts, at 2-3, 6-26). The plaintiff maintains that she used the cash advances to purchase office supplies for her "flexiplace" home work space.  (Pl. Facts, ¶ 35; Thompson Dep. at 127).  She also states that she had Mr. Wishnick's permission to use her federal government credit card for this purpose.  (Pl. Challenges, ¶¶ 43, 77, 83-84).  However, Ms. Thompson never submitted receipts or vouchers to the OFCCP for any of those expenses, even though she personally paid the bills from Citibank for purchases made with the credit card and might have received reimbursement if she submitted documentation.  (Pl. Facts, ¶ 43; Thompson Dep. at 128-29).

On January 7, 2003, Anne Baird-Bridges, the Director of the

Office of Management, Administration and Planning at the ESA, sent a memorandum to all ESA employees concerning their use of federal government credit cards. (Memorandum dated Jan. 7, 2003 ("2003 Memo"), attached as Exh. 7 to Pl. Facts). The memorandum stated in part:

> This serves as a reminder to all employees of the proper use of the government travel card. As a cardholder, you agreed that you are responsible for ensuring that the card is used for authorized government travel and travel-related expenses only. Authorized travel expenses include payment for passenger transportation services, subsistence expenses, and other allowable expenses incurred in connection with official travel away from your official duty station. Use of the travel card for personal purposes is strictly prohibited. Not complying with the terms and conditions prescribed in the cardholder's agreement, including being delinquent in paying the travel card bill, is also prohibited. Any unauthorized use of the government travel card, including ATM withdrawals, or becoming delinquent in paying the travel charge card is a serious matter and constitutes employee misconduct.

(2003 Memo at 1). The plaintiff does not deny that she received this memo on or about January 7, 2003. (Pl. Challenges, ¶ 32).

In July of 2004, Rachel Torres, then a Program Analyst for OFCCP's Northeast Regional Office, was given the task of conducting an audit of the government credit card usage of approximately 75 employees who were suspected of having misused their credit cards over the course of the preceding twelve months. (Pl. Facts, ¶¶ 18, 21-22; Def. Facts, ¶¶ 44-46; Declaration of Rachel Torres dated Feb. 2009 ("Torres Decl."), ¶ 8). The audit found that seven employees had suspicious transactions on their federal government

credit cards, including Ms. Thompson and Wilson Pierre-Louis, another Grade 12 Equal Opportunity Specialist working in the New York District Office. (Pl. Facts, ¶ 23; Def. Facts, ¶ 47; Torres Decl., ¶ 9). Mr. Pierre-Louis was born on April 8, 1959, and is of Haitian national origin.[2] (Pl. Facts, ¶¶ 84-85; Def. Facts, ¶ 115).

Ms. Torres shared the results of her audit with Harold Busch, the Acting Regional Director of OFCCP, in July and August of 2004.[3] (Pl. Facts, ¶ 24; Def. Facts, ¶ 47; Torres Decl., ¶ 9). Mr. Busch and Ms. Torres discussed the results of the audit with relevant managerial employees in the Northeast Region, including Kenneth Baisden, the District Director for the New York District Office, and Brenda Montgomery, the Assistant District Director. (Pl. Facts, ¶¶ 24, 27-28; Declaration of Kenneth J. Baisden, Sr. dated March 2, 2009 ("Baisden Decl."), ¶ 10; Declaration of Brenda Montgomery dated Feb. 25, 2009 ("Montgomery Decl."), ¶ 10). Mr. Baisden is an African-American man; he was 59 years old as of March 2, 2009, and he is disabled. (Baisden Decl., ¶ 2). Ms. Montgomery was born in the United States; as of February 25, 2009, she was 53

_____

[2] Ms. Thompson apparently bases her claim of national origin discrimination on the fact that, although both she and Mr. Pierre-Louis are black, Ms. Thompson was born in the United States while Mr. Pierre-Louis was born in Haiti. (Pl. Challenges, ¶¶ 97, 101, 103).

[3] Ms. Thompson disputes the timing of the audit and how it was disseminated. (Pl. Challenges, ¶ 47).

years old.   (Montgomery Decl., ¶ 2).

Upon learning of Ms. Thompson's alleged credit card abuse, Mr. Baisden met with Ms. Thompson and asked her to turn in her federal government credit card.  (Def. Facts, ¶ 52).  Mr. Baisden asserts that at this meeting he also asked the plaintiff about the ATM cash advances that appeared on her credit card statement, and that the plaintiff denied taking out the cash advances and suggested that her son may have been responsible.  (Def. Facts, ¶¶ 52-53; Baisden Decl., ¶ 12).  Mr. Baisden states that he found this explanation to lack credibility.  (Def. Facts, ¶ 54; Baisden Decl., ¶ 12).  Ms. Thompson denies mentioning her son at that meeting.  (Pl. Challenges, ¶¶ 53, 86).

As part of his investigation into Ms. Thompson's credit card usage, Mr. Baisden inquired whether she had any prior disciplinary history; after looking in the plaintiff's personnel file, he uncovered the June 2002 memorandum reprimanding her for credit card abuse.  (Baisden Decl., ¶ 11; Torres Decl., ¶ 10).  As a result of that discovery, Mr. Baisden asked Ms. Torres to procure additional credit card records for Ms. Thompson dating back two years to July of 2002.  (Baisden Decl., ¶ 11; Torres Decl., ¶¶ 10).  Ms. Torres retrieved the requested records and forwarded them to Mr. Baisden and Ms. Montgomery in August of 2004.  (Torres Decl., ¶¶ 11-12;

Baisden Decl., ¶ 13).[4]

Also in August of 2004, Ms. Torres informed Mr. Baisden and Ms. Montgomery that Mr. Pierre-Louis had suspicious transactions on his federal government credit card. (Def. Facts, ¶ 95; Baisden Decl., ¶ 27; Montgomery Decl., ¶ 17). In September of 2004, Ms. Torres forwarded Mr. Pierre-Louis' credit card records from February of 2004 through July of 2004 to Mr. Baisden and Ms. Montgomery. (Def. Facts, ¶ 95; Torres Decl., ¶ 15; Baisden Decl., ¶ 27). She also forwarded them a letter from Citibank indicating that Mr. Pierre-Louis was delinquent in making payments on his card. (E-mail from Kenneth J. Baisden to Brenda A. Montgomery dated Sept. 2, 2004, attached as Exh. 11 to Torres Decl.; Torres Decl., ¶ 15; Baisden Decl., ¶ 27; Montgomery Decl., ¶ 17). Ms. Torres states that she provided Mr. Baisden and Ms. Montgomery with only six months of credit card statements for Mr. Pierre-Louis because she believed that he had no credit card activity before February 2004. (Torres Decl., ¶ 14; Def. Facts, ¶ 94).

After receiving the credit card statements, Mr. Baisden inquired as to whether Mr. Pierre-Louis had any past history of

---

[4] Ms. Thompson questions Mr. Baisden's veracity and disputes the timing of his purported request for her 2002-03 credit card records (Pl. Challenges, ¶ 51), noting that the bank statements allegedly procured by Ms. Torres in July or August of 2004 appear to have been printed on June 10, 2004. (Pl. Challenges, ¶ 51); Cardholder Statements of Barbara Thompson dated July 2002 through April 2004, attached as Exh. 7 to Torres Decl.). This discrepancy as to dates, however, does not materially impact the analysis.

credit card abuse; his investigation did not turn up any past infractions. (Def. Facts, ¶ 97; Baisden Decl., ¶ 27). In fact, Mr. Pierre-Louis had received an oral reprimand for abuse of his federal government credit card in June of 2002. (Def. Facts, ¶ 105; Baisden Decl. ¶¶ 30, 32; Torres Decl., ¶ 13). Mr. Baisden states that he was unaware of this prior reprimand because there was no record of it in Mr. Pierre-Louis's personnel file in August of 2004. (Baisden Decl., ¶ 30). Ms. Torres was aware that Mr. Pierre-Louis had previously been investigated for misuse of his federal government credit card, because she had flagged Mr. Pierre-Louis's credit card statements as suspicious in May of 2002 and forwarded them to his supervisor at the time, Assistant District Director Michele Hodge in the OFCCP office in New Jersey. (Torres Decl., ¶ 13). However, Ms. Torres denies that she was aware of Ms. Hodge's decision to discipline Mr. Pierre-Louis orally and states that she was not given any written documents relating to the discipline for placement in Mr. Pierre-Louis's personnel file. (Torres Decl., ¶ 13). As a result, Mr. Baisden only first became aware of Mr. Pierre-Louis' prior oral reprimand when Mr. Pierre-Louis was deposed in June of 2005. (Def. Facts, ¶ 103; Baisden Decl., ¶ 32).

Upon receiving the credit card statements of both Ms. Thompson and Mr. Pierre-Louis from Ms. Torres, Ms. Montgomery compared the statements to Ms. Thompson's and Mr. Pierre-Louis' periods of

authorized travel.   (Montgomery Decl., ¶¶ 12, 17-18).   After
eliminating those charges which she determined were valid uses of
the federal government credit card, Ms. Montgomery found that
during the period August 20, 2002, through April 30, 2004, Ms.
Thompson had obtained 26 unauthorized cash advances totaling
$1,619.60 for which she had provided no receipts. (Montgomery
Decl., ¶ 12).   After examining Mr. Pierre-Louis' records, Ms.
Montgomery concluded that he had made $1,809.07 worth of
unauthorized transactions during the period February 23, 2004,
through July 26, 2004, including "nine unauthorized cash
withdrawals totaling $829.75; thirty-four unauthorized purchases of
gasoline totaling $880.24; and two other unauthorized purchases
totaling $99.08."   (Montgomery Decl., ¶ 18).

    It was Ms. Montgomery's opinion that, based on her findings,
both Ms. Thompson and Mr. Pierre-Louis should be terminated.
(Montgomery Decl., ¶¶ 13, 18).   Regarding the plaintiff, Ms.
Montgomery stated:

> I would have proposed that Ms. Thompson be removed even
> in the absence of the June 2002 reprimand because her
> post-June 2002 misconduct involved numerous incidents by
> a senior compliance officer over almost a twenty-month
> period.  The EO Specialist position requires integrity.
> An EO Specialist has access to sensitive information
> concerning the employees of federal contractors,
> including payroll and other personnel records, that are
> investigated by OFCCP.  I personally lost confidence in
> Ms. Thompson's ability to conduct herself with the
> integrity that the EO Specialist position requires.
> Because she continued to abuse her travel card after
> being warned that she could be terminated for that
> conduct, I saw no prospect for rehabilitation and,

consequently, no alternative to her removal.
(Montgomery Decl., ¶ 14).  With respect to  Mr. Pierre-Louis, Ms.
Montgomery noted that although he had only been employed by DOL for
four years, the "sheer number of improper transactions at issue
caused [her] to lose confidence in Mr. Pierre-Louis's ability to
conduct himself with the integrity required of his position as a
compliance officer."  (Montgomery Decl., ¶ 18).

Ms. Montgomery drew up a Notice of Proposed Removal for Ms.
Thompson and provided her with a copy of it on August 19, 2004.
(Proposed Removal Notice at 1; Def. Facts, ¶ 61; Montgomery Decl.,
¶ 13).  Ms. Montgomery asked Ms. Thompson to direct any response to
Mr. Baisden.  (Montgomery Decl., ¶ 15).  On September 29, 2004, Ms.
Thompson's attorney, Raymond Nardo, sent a letter to Mr. Baisden,
denying that Ms. Thompson had used her federal government credit
card improperly and alleging that she was being treated more
harshly than other DOL employees due to her race, sex, and age.
(Letter from Raymond Nardo to Kenneth J. Baisden, Sr. dated Sept.
29, 2004, attached as Exh. 3 to Baisden Decl.).

Ms. Thompson met with Mr. Baisden on November 30, 2004, to
speak with him directly about the Notice of Proposed Removal.
(Baisden Decl., ¶ 17.; Def. Facts, ¶ 75).  At that meeting, she
denied using her federal government credit card improperly and said
that she had Mr. Wishnick's permission to use the card to purchase
supplies for her home office.  (Def. Facts, ¶ 75; Baisden Decl., ¶

17).  Mr. Baisden states that he did not believe that Mr. Wishnick had given her such permission; however, Mr. Baisden did not contact Mr. Wishnick to verify this.  (Baisden Decl., ¶ 18; Pl. Challenges, ¶ 75).  In subsequent testimony before the U.S. Merit Systems Protection Board (the "MSPB"), Mr. Baisden stated that, in the same meeting, Ms. Thompson accused him of bias against her on the basis of her age and disability.  (Testimony of Kenneth Baisden ("Baisden Testimony"), attached as Exh. 3 to Pl. Facts, at 8).

On January 13, 2005, Mr. Baisden issued a Removal Decision sustaining Ms. Montgomery's findings and terminating Ms. Thompson, effective January 31, 2005.  (Memorandum dated Jan. 13, 2005, attached as Exh. 5 to Baisden Decl., at 1).  In reaching this decision, Mr. Baisden stated that he considered the sensitivity of the plaintiff's work, her prior history of federal government credit card misuse, the short interval between her 2002 reprimand and the date on which she began making ATM cash withdrawals, her failure to take responsibility for her actions, and her long tenure with the OFCCP as aggravating factors underlying his decision to terminate her.  (Baisden Decl., ¶¶ 22-25; Baisden Testimony at 10-13).  Mr. Baisden considered Ms. Thompson's 26-year tenure with the OFCCP to be an aggravating factor because her "senior" employee status "should have [given her] more appreciation for the heightened responsibility that goes along with working for the federal government."  (Baisden Decl., ¶ 24).

Ms. Montgomery issued a Notice of Proposed Removal for Mr. Pierre-Louis on October 14, 2004. (Notice of Proposed Removal of Employee #4 dated Oct. 14, 2004, attached as Exh. 11 to Pl. Facts, at 1; Montgomery Decl., ¶ 18; Baisden Decl., ¶ 28). Mr. Baisden reviewed the charges against Mr. Pierre-Louis and issued a memorandum suspending him for sixty days, effective February 7, 2005. (Memorandum dated Jan. 13, 2005, attached as Exh. 7 to Baisden Decl., at 1). In deciding not to adopt Ms. Montgomery's recommendation to terminate Mr. Pierre-Louis, Mr. Baisden stated that he considered the following mitigating factors: (1) to his knowledge at the time, this was Mr. Pierre-Louis' first offense; (2) Mr. Pierre-Louis had held his job for only four years; and (3) he had misused his federal government credit card for a period of not more than six months. (Baisden Decl., ¶ 29).

Both Ms. Thompson and Mr. Pierre-Louis appealed Mr. Baisden's disciplinary decisions to the MSPB. (Pl. Facts, ¶ 4; Def. Facts, ¶ 102). DOL settled Mr. Pierre-Louis's case, reducing his punishment to a forty-five day suspension without pay. (Pl. Facts, ¶ 83; Def. Facts, ¶ 102; Baisden Decl., ¶ 31). The MSPB held a hearing in Ms. Thompson's case on August 1 and 2, 2005, following which it affirmed Mr. Baisden's termination of the plaintiff and rejected her affirmative defense of discrimination. (Pl. Facts, ¶¶ 4-5). The MSPB subsequently denied Ms. Thompson's petition for review, and she filed an appeal of the MSPB decision with the U.S. Equal

Employment Opportunity Commission ("the EEOC").  (Pl. Facts, ¶ 6).
On August 23, 2006, the EEOC upheld the MSPB's finding that no
discrimination had occurred.  (EEOC Decision dated Aug. 23, 2006,
attached as Exh. 1 to Complaint, at 1).  Ms. Thompson filed her
Complaint with this Court on October 10, 2006.  (Complaint at 1).

<u>Discussion</u>

  A. <u>Summary Judgment Standard</u>

     Under Rule 56 of the Federal Rules of Civil Procedure, summary
judgment is appropriate where "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is
no genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);
<u>accord</u> <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 285-86 (2d
Cir. 2002); <u>Andy Warhol Foundation for the Visual Arts, Inc. v.</u>
<u>Federal Insurance Co.</u>, 189 F.3d 208, 214 (2d Cir. 1999).  The
moving party bears the initial burden of identifying "the absence
of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986).  The opposing party then must come
forward with "specific facts showing a genuine issue for trial."
Fed. R. Civ. P. 56(e)(2).  Where the non-movant fails to make "a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial," summary judgment must be granted.
<u>Celotex</u>, 477 U.S. at 322.

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249 (citation omitted), and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. Id. at 249-50. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288 (1968)).

In addition, the court's review of the record is limited to facts that would be admissible at trial. Rule 56(e) states that affidavits in support of or against summary judgment shall "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(e)(1). Accordingly, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).

B.  <u>Analytic Framework of Title VII and the ADEA</u>

Claims of discrimination under Title VII are analyzed in accordance with the three-part framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). This same framework applies to employment discrimination claims under the ADEA.  <u>See</u> <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 612 (1993) (finding <u>McDonnell Douglas</u> analysis to apply in ADEA cases); <u>Abrahamson v. Board of Education</u>, 374 F.3d 66, 71 (2d Cir. 2004) (same).

In the first stage of the <u>McDonnell Douglas</u> analysis, the plaintiff must establish a prima facie case of discrimination by showing that (1) she is within a protected group, (2) she was qualified for the job at issue, (3) she was subjected to an adverse employment action, and (4) this action occurred under circumstances giving rise to an inference of discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005).  One way for a plaintiff to establish an inference of discrimination is to show that the employer "treated [her] less favorably than a similarly situated employee outside [her] protected group." <u>Graham v. Long Island Rail Road</u>, 230 F.3d 34, 39 (2d Cir. 2000).  Because an employer engaged in discrimination is unlikely to leave a "smoking gun," <u>Forsyth v. Federation Employment and Guidance Service</u>, 409 F.3d 565, 569 (2d Cir. 2005), a plaintiff usually must rely on the "cumulative weight of circumstantial

evidence" when proving bias.  Walker v. New York City Department of Corrections, No. 01 Civ. 1116, 2008 WL 4974425, at *10 (S.D.N.Y. Nov. 19, 2008) (quoting Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)).

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993) (quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981)).  Despite this shift of the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253; see also St. Mary's Honor Center, 509 U.S. at 507.

If the defendant provides evidence of legitimate nondiscriminatory reasons for its action, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Burdine, 450 U.S. at 253.  A plaintiff opposing a summary judgment motion "must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false,"  Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir.

1994), and "that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees of Columbia University in the City of New York, 131 F.3d 305, 312 (2d Cir. 1997). The issue for the court "is not whether the employer reached a correct conclusion" in taking the employment action; rather, the question is "whether the employer made a good-faith business determination." Baur v. Rosenberg, Minc, Falkoff & Wolff, No. 07 Civ. 8835, 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008).

     C. Analysis of the Plaintiff's Termination

       1. Prima Facie Case

Ms. Thompson has successfully presented all four elements of a prima facie case. There is no dispute that: (1) as an African-American woman who, at the time of her termination, was 57 years old, she was a member of protected groups; (2) she was qualified for her job with DOL; and (3) she was terminated by DOL in January of 2005. See McDonnell Douglas, 411 U.S. at 802 (explaining elements of prima facie case).

Regarding the fourth element, the defendant's alleged disparate treatment of Ms. Thompson and Mr. Pierre-Louis is sufficient to create an inference that the plaintiff's termination was based on discrimination. Graham, 230 F.3d at 40 (holding that two employees' conduct "need not be identical . . . for the two to be similarly situated"). Ms. Thompson is a woman, was born in the

United States, and was 57 years old at the time she was fired.  Mr. Pierre-Louis is a man, he is of Haitian national origin, and he is 13 years younger than the plaintiff.  Despite Mr. Pierre-Louis' shorter tenure as an Equal Opportunity Specialist, he held the same job title as Ms. Thompson and also worked on job sites where he had access to the sensitive personal information of others.  Mr. Pierre-Louis' misbehavior was of the same nature as the plaintiff's: misuse of a federal government credit card.  In fact, his malfeasance was more extensive in terms of the total dollar value of the unauthorized charges, even though it took place over a shorter period of time.  Ms. Thompson's and Mr. Pierre-Louis' misbehavior was discovered at the same time, and the same decision-makers were responsible for assessing the severity of their conduct and meting out punishment.  Yet despite these similarities, Ms. Thompson was terminated while Mr. Pierre-Louis initially received a sixty day suspension, which was shortened to  forty-five days following a settlement with DOL.  The different treatment of these two persons is therefore sufficient to create an inference that Ms. Thompson's termination was motivated by age, national origin, or gender discrimination.

### 2. Legitimate Business Reasons for Termination

In response to the plaintiff's claims, the defendant argues that its decision to terminate Ms. Thompson was based on her misuse of her federal government credit card.  (Memorandum of Law in

Support of Defendant's Motion for Summary Judgment at 23-24).  The defendant has provided copious evidence to support its claim, including documents demonstrating the plaintiff's history of credit card misuse, the course of the OFCCP's 2004 audit and investigation, and the process leading to her termination.

The defendant has also proffered legitimate reasons explaining the discrepancy in its treatment of Ms. Thompson and Mr. Pierre-Louis.  When he made the decision to suspend Mr. Pierre-Louis, Mr. Baisden was unaware of his prior history of federal government credit card misuse.  In contrast, when he decided to terminate Ms. Thompson, Mr. Baisden knew that she had received a prior reprimand for abusing her credit card.  In addition, Mr. Baisden was aware when he made the disciplinary decisions that the plaintiff had been working at the OFCCP for over twenty years, whereas Mr. Pierre-Louis had been employed for only four years.  This difference led Mr. Baisden to expect Ms. Thompson to demonstrate more responsibility.

As a result of these differences, Mr. Baisden stated that he found Ms. Thompson's conduct to be of a more serious nature than that of Mr. Pierre-Louis and that she appeared to be a less likely candidate for rehabilitation.  These statements, and the supporting evidence, comprise a "legitimate, nondiscriminatory reason" for terminating Ms. Thompson.  <u>Burdine</u>, 450 U.S. at 254.

3. <u>Pretext</u>

The burden therefore shifts back to Ms. Thompson "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Id.</u> at 253.  The plaintiff advances five arguments in support of her contention that the defendant's proffered business reason is pretextual.  None of these supports a finding that Ms. Thompson was fired for any reason other than misuse of her federal government credit card; therefore, her allegations of discrimination against DOL must fail.

First, Ms. Thompson argues that she did not, in fact, misuse her federal government credit card.  She states that she was unaware that the card was restricted to travel-related expenses and that she had permission from Mr. Wishnick to use the card for all job-related expenses, including the purchase of supplies for working at home.  This argument is irrelevant to the Title VII analysis, however.  The proper question is not whether Mr. Baisden decided correctly that Ms. Thompson had misused her credit card; rather, it is whether Mr. Baisden's decision was made in good faith or if it was a pretext for discrimination.  <u>Baur</u>, 2008 WL 5110976, at *5.  The plaintiff has failed to provide any evidence indicating that Mr. Baisden's decision to fire her was based on anything aside from his belief that she had misused her federal government credit card.

Second, Ms. Thompson points out that the copies of her 2002-03 credit card records that Ms. Torres claims she did not receive until August of 2004 have the date "6/10/04" printed on them. While Ms. Thompson is correct, it is unclear what conclusion can be drawn from this that would be of assistance to her, as she has failed to identify any way in which this inconsistent date affects any material fact. Mr. Baisden asserts that he made the decision to terminate Ms. Thompson based on her misuse of her federal government credit card; <u>when</u> he made that decision -- be it June, July, or August of 2004 -- does not impact the legitimacy of the decision. Moreover, Ms. Thompson's identification of a discrepancy in the dates on the defendant's documents does not by itself suggest that Mr. Baisden harbored discriminatory animus towards her.

Third, Ms. Thompson challenges Mr. Baisden's proffered reason for terminating her. She states that her workload increased following her first meeting with Mr. Baisden in July of 2004 and argues that this undermines Mr. Baisden's claim that he lost confidence in her abilities following his discovery of her credit card misuse. (Pl. Challenges, ¶¶ 65-66, 81). This argument misstates the defendant's position. Mr. Baisden did not state that he lost confidence in the plaintiff's ability to do her work; rather, he expressed concern that "Thompson's lack of integrity could undermine the public confidence in OFCCP's role as an

investigator." (Baisden Decl., ¶ 22).

Fourth, Ms. Thompson questions whether integrity is a necessary characteristic for an Equal Opportunity Specialist. She argues that, although she had access to employees' private information while doing on-site investigations, she was not allowed to remove that information from the site. (Pl. Challenges, ¶ 81). As with the plaintiff's first argument, this one is immaterial because it goes to whether Mr. Baisden's decision to terminate her was correct, not whether it was legitimate.

Finally, Ms. Thompson states that "Torres, Hodge and Pierre-Louis are from the Caribbean and all were friends." (Pl. Challenges, ¶¶ 101, 103, 105). Her observation that these three co-workers shared roughly similar national origins fails to amount to a claim of discrimination. Ms. Thompson has provided no evidence that these three employees, or any others, treated her differently because of her national origin, age, sex, or any other protected characteristic. Even if the plaintiff had provided evidence that Ms. Torres, Ms. Hodge, or Mr. Pierre-Louis felt animus toward her as a result of her national origin, she would still need to prove that Mr. Baisden, a disabled African-American man close to her age, shared those discriminatory beliefs and acted upon them when firing her.

In sum, Ms. Thompson has failed to provided only vague innuendo in support of her claim that Mr. Baisden's decision to

fire her was based in whole or in part on discriminatory animus; in fact, she has failed to provide evidence that his decision was based on anything other than his belief that she had misused her federal government credit card.   Because Ms. Thompson has not sustained her burden of proof under the Title VII and the ADA, her claim fails.[5]

## Conclusion

For the reasons set forth above, the defendant's motion for summary judgment is granted.   The Clerk of Court is respectfully requested to enter judgment accordingly and close the case.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       May 27, 2009

---

[5] The defendant has challenged the admissibility of certain transcripts appended to the Plaintiff's Statement of Facts on the ground that they are unauthenticated.   I need not reach this issue because neither the transcripts provided by the plaintiff nor the statements that she makes in reliance upon them change the outcome of the instant analysis.   If that were not the case, I would provide Ms. Thompson an opportunity to cure any evidentiary shortcomings.   I note further that the defendant has failed to identify a single substantive inaccuracy in the transcripts that Ms. Thompson submitted.

24

Copies mailed this date:

Dennis L. Friedman, Esq.
1515 Market Street, Suite 714
Philadelphia, PA 19102

Joseph A. Pantoja, Esq.
Assistant United States Attorney
86 Chambers Street
New York, New York 10007